**Opinion filed March 19, 2020**



In The

# Eleventh Court of Appeals

_____

## No. 11-18-00056-CR

_____

## JOHN LOUIS ATKINS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 20106B**

## MEMORANDUM OPINION

The State charged John Louis Atkins with first-degree murder under Section 19.02 of the Texas Penal Code. TEX. PENAL CODE ANN. § 19.02(b), (c) (West 2019). The jury found Appellant guilty of the offense and assessed his punishment at confinement for sixty-seven years. The trial court sentenced him accordingly. We affirm.

On appeal, Appellant raises four issues. First, Appellant claims that he was arrested without a warrant and without probable cause. In his second issue on appeal, Appellant claims that there was no probable cause to support the warrant to search Appellant's vehicle. In his third issue on appeal, Appellant claims that the police violated his Fourth Amendment rights when they seized his vehicle from his employer's private parking lot without a warrant and without probable cause. Finally, in his fourth issue on appeal, Appellant claims that the State was collaterally estopped from introducing evidence that Appellant was in possession of the murder weapon.

On appeal, Appellant does not challenge the sufficiency of the evidence to support his conviction. Therefore, we will discuss the evidence related to the commission of the offense only in such detail as is necessary to the resolution of the issues raised on appeal.

Appellant filed a pretrial motion to suppress. Detective Eric Vickers testified at the hearing on that motion. On July 26, 2015, Detective Vickers was a Crimes Against Persons detective with the Abilene Police Department. On that date, he was called to assist in the investigation of a homicide. The victim was Latisha Hilley. The body was found in a remote area behind a dilapidated house. Detective Vickers testified that he did not do much to assist in the investigation at the scene.

However, Detective Vickers testified that, sometime later, he spoke with Sybil Rene Brito. He referred to Brito and Avery Blane Burns as Hilley's roommates. When he talked with Brito, Detective Vickers discovered that Hilley worked as a prostitute. Detective Vickers testified that Brito told him that Hilley had been dropped off on South First Street around 1:00 a.m. on July 26, 2015, for her to work as a prostitute.

Brito said that Hilley always had her phone and kept in contact with Brito and Burns continually. However, later that morning, at 2:37 a.m., Hilley called from an

2

unknown number. Hilley said that she had made $50 and was going to return home. Hilley also said that the battery on her phone had died. Hilley did not return home. Out of concern, Brito called the unknown number, but there was no answer. The information on the voicemail greeting indicated that the phone number belonged to "John Atkins."

Detective Vickers testified that he learned from other officers that Hilley had made no other contact with anyone after the 2:37 a.m. call to Brito and Burns. Detective Vickers also learned from other officers that Appellant had registered for a room at the Country Hearth Inn & Suites and had used the same "unknown" phone number that Hilley had used. Detective Vickers also learned that Appellant was employed by Lauren Engineering. As a result of this information, Detective Vickers went to Lauren Engineering to contact Appellant.

Detectives Joel Harris and Russell Antilley were also assigned to contact Appellant at Lauren Engineering, and they did so before Detective Vickers arrived. At the hearing on the motion to suppress, Detective Harris testified that he was told by the Crimes Against Persons sergeant that Appellant was a person of interest in an ongoing homicide investigation. Detective Harris was given a photo of Appellant's driver's license and was told by other officers that they had reasonable suspicion to detain Appellant.

Detective Harris testified that, as he and Detective Antilley arrived at the employee parking area at Lauren Engineering, he saw Appellant walking out of a building toward his vehicle, a Ford "'F' series truck." Detective Harris stated that Appellant's truck was parked behind a fence but that he and Detective Antilley "drove right into [the parking lot]." He also stated that he did not see a sign that read "hard hat area only." In addition, Detective Harris testified that the gate was open on the evening that he contacted Appellant.

3

While Detective Antilley notified other officers of Appellant's location, Detective Harris got out of his vehicle, identified himself, and told Appellant that another detective needed to talk to him. Detective Harris testified that he told Appellant to remain where he was and not to go near his truck. However, Appellant appeared nervous and tried more than once to reach his truck. Detective Harris stated that there were "several occasions" when he had to physically block Appellant's path to the truck. Detective Harris testified that he did not allow Appellant into his truck because he was concerned that, given the nature of the crime under investigation, there may have been weapons in the truck and also because he wanted to prevent the destruction of any potential evidence.

When Detective Vickers arrived at Lauren Engineering, he told Appellant that Appellant was detained. He also told Appellant that applications for search warrants were being prepared so that the police could search Appellant's truck and motel room.

Detective Vickers eventually left Lauren Engineering to apply for search warrants. Another officer arrived to take Appellant to his motel room. As he was making applications for the search warrants, Detective Vickers learned from another detective that a cigarette butt that Appellant had discarded while talking to Detective Harris was the same brand and similar filter as a cigarette found near Hilley's body.

While Detective Vickers applied for the search warrants, Detective Harris stayed with Appellant's truck at Lauren Engineering. Later, but before the search warrant was obtained, Appellant's truck was towed to a secure bay controlled by the police department. After the search warrant was obtained, the police searched Appellant's truck. Among other items, the police found a .38 caliber Smith & Wesson "five-shot revolver." A firearms and tool marks examiner later determined that the bullet retrieved from Hilley's body was fired from the gun found in Appellant's truck.

We will first discuss Appellant's claim that the police officers violated his Fourth Amendment rights when they illegally detained and arrested him. Specifically, Appellant maintains that the officers detained him without reasonable suspicion and subsequently arrested him without a warrant and without probable cause. Thus, Appellant argues, the evidence that was discovered as a result should have been suppressed.

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). We give "almost total deference to the trial court's determination of historical facts" and review the trial court's application of search and seizure law to those facts de novo. *Id.* (quoting *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997)). Where, as here, the trial court does not make explicit findings of fact, we review the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that are supported in the record. *Id.*

"Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). Reasonable suspicion is based on the totality of the circumstances and exists when the officer has "specific, articulable facts" that, when combined with rational inferences from those facts, would lead the officer to reasonably conclude that the person detained "is, has been, or soon will be engaged in criminal activity." *Id.*; *Campbell v. State*, 325 S.W.3d 223, 231 (Tex. App.—Fort Worth 2010, no pet.).

In contrast, a warrantless arrest is justified only if "probable cause exists with respect to the individual in question" and the arrest falls within one of the statutory exceptions in Article 14 of the Texas Code of Criminal Procedure. *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). "Probable cause to arrest exists when facts and circumstances within the knowledge of the arresting officer, and of which

he has reasonably trustworthy information, would warrant a reasonably prudent person in believing that a particular person has committed or is committing a crime." *Meiburg v. State*, 473 S.W.3d 917, 922 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

Both investigative detentions and arrests are seizures. *Josey v. State*, 981 S.W.2d 831, 838 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). Under both the United States and Texas constitutions, a seizure occurs when "a reasonable person would believe he or she was not free to leave, and that person has yielded to the officer's show of authority or has been physically forced to yield." *Id.* While there is no bright-line test to distinguish an investigatory detention from an arrest, courts consider several factors, which include, but are not limited to, "the amount of force used to control the suspect, the duration of the detention, and the officer's expressed intent, i.e., whether he told the individual that he was under arrest or was being detained only for a temporary investigation." *Crofton v. State*, 541 S.W.3d 376, 379 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

"An investigative detention . . . is a brief detention of a person reasonably suspected of criminal activity to determine his identity or to maintain the status quo . . . while obtaining more information." *Josey*, 981 S.W.2d at 838. An arrest occurs "when a person's liberty of movement is restricted or restrained." *Id.* However, generally, "[w]hether a seizure is an actual arrest or an investigative detention depends on the reasonableness of the intrusion under all of the facts." *Campbell*, 325 S.W.3d at 234.

In this case, when Detective Harris contacted Appellant, Detective Harris identified himself as a police officer and told Appellant that he needed to stay where he was and not go near his truck. Therefore, a seizure occurred when Appellant yielded to Detective Harris's show of authority. When Detective Vickers arrived, he told Appellant that he was detained and not free to leave while officers applied

for search warrants.  Appellant claims that this encounter with Detective Vickers amounted to an arrest because "Appellant was not free to leave and would have been physically restrained by the police if he tried to do so."

However, a Fourth Amendment investigative detention allows officers to temporarily detain a person under circumstances when that person is not free to leave.  *State v. Sheppard*, 271 S.W.3d 281, 289 (Tex. Crim. App. 2008).  Detective Vickers testified that he needed "to maintain . . . that vehicle in the state it's in as quickly as possible if we believe that it may have been used in a crime."  Thus, officers briefly detained Appellant to maintain the status quo, and we do not find that it was unreasonable to restrict Appellant's access to his truck to achieve this purpose.  We find, therefore, that Appellant was detained and not arrested.

We must now determine whether the officers had reasonable suspicion to justify the detention.  As previously stated, reasonable suspicion exists when an officer has "specific, articulable facts" and reasonable inferences from those facts that would lead the officer to reasonably conclude that a particular person has been involved in criminal activity.  *Derichsweiler*, 348 S.W.3d at 914; *Campbell*, 325 S.W.3d at 231.  This standard is objective and disregards the subjective intent of the arresting officer and instead looks to whether there was an objectively justifiable basis for the detention.  *Derichsweiler*, 348 S.W.3d at 914.  "Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, 'the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists.'"  *Id.* (quoting *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)).

At the hearing on the motion to suppress, Detective Vickers testified that reasonable suspicion to detain Appellant was based on the following: Brito's sworn statement that, when she called the number from which Hilley had previously called,

information on the voicemail message indicated that the number belonged to Appellant; information from other officers that Appellant had used the same telephone number when he registered for his room at the Country Hearth Inn & Suites; information from other officers that Hilley made no other phone calls after the call from Appellant's phone at 2:37 a.m.; information that Appellant's phone had been turned off "for a period of hours"; and Detective Vickers's belief that, because the body was found in a remote area, a vehicle was involved in the crime.

Based upon these facts, we conclude that the police had "specific, articulable facts" that, when "combined with rational inferences from those facts," would lead them to reasonably conclude that Appellant had been engaged in criminal activity. *Campbell*, 325 S.W.3d at 231. We overrule Appellant's first issue on appeal.

Next, we will discuss Appellant's claim that there was no probable cause to support the search warrant for Appellant's truck. Appellant argues that the sworn affidavit of Detective Vickers did not set out probable cause to search Appellant's truck and that, therefore, all evidence obtained as a result of the warrant should be suppressed.

Our standard of review of a trial court's decision on a motion to suppress is the same as previously stated, and we will not repeat it here. Under both the United States and Texas constitutions, "no search warrant shall issue except upon probable cause as supported by an oath or affirmation." *Aguirre v. State*, 490 S.W.3d 102, 107–08 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Likewise, "the Texas Code of Criminal Procedure provides that no search warrant shall issue except upon an affidavit establishing probable cause." *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 18.01(b) (West Supp. 2019). For probable cause to be sufficient to justify the issuance of a search warrant, the affidavit must set out "sufficient facts for the magistrate to conclude that the item to be seized will be on the described premises at the time the warrant issues and the search executed." *Crider v. State*, 352 S.W.3d

704, 707 (Tex. Crim. App. 2011). Under the totality of the circumstances, there must be a "'fair probability' that contraband or evidence of a crime will be found at the specified location." *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

When we review a magistrate's decision to issue a warrant, we apply a "highly deferential standard in keeping with the constitutional preference for a warrant," and we "interpret the affidavit in a commonsensical and realistic manner, recognizing that the magistrate may draw reasonable inferences." *Id.* at 61. In addition, we are limited to the "four corners of the affidavit" to determine whether probable cause exists. *Massey v. State*, 933 S.W.2d 141, 148 (Tex. Crim. App. 1996).

Under the facts of this case, the search warrant for Appellant's vehicle authorized police to seize "[a]ny and all items related to the offense of Texas Penal Code 19.02, Murder, including but not limited to: firearms, ammunition, a cellular telephone associated with [Hilley's phone number], hairs, and/or bodily fluids, and finger prints [sic]." In the affidavit for the search warrant, Detective Vickers relayed a number of facts and inferences, including all the information he received from Brito; information from other officers about Hilley's phone records and about Appellant's phone records prior to and after the body was found; the fact that Appellant smoked cigarettes similar to the one found near Hilley's body; information about his training and experience as an officer in the Crimes Against Persons Unit; his belief that, based on that experience, fingerprints, hairs, skin cells, and possibly bodily fluids would have transferred from Hilley's body to the interior of Appellant's truck; and an explanation as to why, based on the evidence gathered, he believed Appellant was the last person to see Hilley alive.

Detective Vickers's affidavit contained more information than we have detailed here, but we believe that the facts and inferences we have set forth were sufficient for an issuing magistrate to determine that there was a fair probability that

9

evidence of a crime would be found in Appellant's truck. Therefore, we hold that probable cause supported the issuance of the search warrant relative to Appellant's truck. We overrule Appellant's second issue on appeal.

Next, we will discuss Appellant's claim that the police officers violated his right to privacy. Specifically, Appellant argues that, because his truck was parked in a private parking area for employees only, the officers needed to obtain permission to enter the premises before they entered the parking lot. Appellant asserts that the officers did not get that permission. He claims, therefore, that any evidence obtained from his truck should be suppressed.

"The occupant of a business establishment enjoys the same constitutional right to be free from unreasonable searches as does the occupant of a private residence." *State v. Weaver*, 349 S.W.3d 521, 526–27 (Tex. Crim. App. 2011). However, "[t]he expectation of privacy on commercial premises is less than the expectation of privacy in a person's home." *Sanchez v. State*, No. 14-14-00638-CR, 2016 WL 3131639, at *3 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (mem. op., not designated for publication) (citing *New York v. Burger*, 482 U.S. 691, 700 (1987)).

For Appellant to claim that his privacy rights were violated, he must have "a recognizable privacy stake that supports a Fourth Amendment right." *Id.* This is because Appellant may claim only that *his* rights have been violated, "he cannot assert that he is entitled to benefit because the rights of another have been violated." *Id.* (quoting *State v. Granville*, 423 S.W.3d 399, 405 (Tex. Crim. App. 2014)). Indeed, "[a]ny defendant seeking to suppress evidence obtained in violation of the Fourth Amendment must first show he personally had a reasonable expectation of privacy that the government invaded." *Id.* Factors that courts consider in a determination of whether a person had a reasonable expectation of privacy include:

10

(1) whether the defendant had a proprietary or possessory interest in the place or object searched;

(2) whether the defendant's presence in or on the place searched was legitimate;

(3) whether the defendant had a right to exclude others from the place or object;

(4) whether the defendant took normal precautions, prior to the search, which are customarily taken to protect privacy in the place or object;

(5) whether the place or object searched was put to a private use;

(6) whether the defendant's claim of privacy is consistent with historical notion[s] of privacy.

*Granville*, 423 S.W.3d at 407–08 (footnotes omitted).

Appellant has presented nothing to show that he had a subjective expectation of privacy in his employer's parking lot. Thus, we find that Appellant lacked standing to contest the validity of the seizure of his truck from the parking lot of Lauren Engineering.

Even if the police should not have entered the employee parking lot of Lauren Engineering, all of the evidence found in Appellant's truck was found pursuant to a valid search warrant. Thus, under the independent source doctrine, the prior alleged illegality did "not contribute in any way to discovery of the evidence seized under the warrant." *Wehrenberg v. State*, 416 S.W.3d 458, 469 (Tex. Crim. App. 2013) (quoting *Segura v. United States*, 468 U.S. 796, 815 (1984)). Therefore, the trial court did not err when it denied Appellant's motion to suppress. *See* CRIM. PROC. art. 38.23(a) (West 2018); *Wehrenberg*, 416 S.W.3d at 468. We overrule Appellant's third issue on appeal.

Finally, we will discuss Appellant's claim that, under the collateral estoppel doctrine, the State could not introduce evidence that Appellant possessed the murder weapon.

11

Before trial, Appellant filed a motion in limine in which he requested that the trial court order the State not to mention or in any way imply, in the guilt/innocence phase of trial, that Appellant was in possession of a ".38 caliber, Iver Johnson/Meriden Arms Co., model Secret Service Special revolver." Appellant alleged in his motion that this request was made because he was found "not guilty" of possession of the same firearm in a federal charge in the Northern District of Texas.

At the hearing on the motion to suppress, Appellant argued that the issue of possession of the murder weapon was barred by collateral estoppel; he subsequently filed a Special Plea of Collateral Estoppel. Appellant produced a copy of the federal indictment and jury verdict whereby a jury had found Appellant not guilty of possession of the same firearm that the police found in Appellant's truck and that Appellant allegedly used in Hilley's murder. At the hearing, the State argued that there was no legal bar against the State that would prevent it from introducing evidence that was the basis of a federal acquittal. The trial court overruled Appellant's special plea.

Collateral estoppel means "that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit" relating to the same event or situation. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)). We believe that the trial court's ruling on Appellant's collateral estoppel claim was proper for two reasons.

First, Appellant's prior acquittal did not determine an ultimate issue with respect to the murder charge and did not require the exclusion of evidence in the murder trial. In a case involving the admissibility of evidence that was related to a previous acquittal, the Supreme Court explicitly declined to extend the collateral estoppel doctrine "to exclude in all circumstances . . . relevant and probative

12

evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted." *Dowling v. United States*, 493 U.S. 342, 344–45, 348 (1990). In *Dowling*, the Court held that the defendant's prior acquittal did not preclude the government—in a subsequent trial for a different offense—from introducing evidence about the offense for which the defendant had previously been acquitted. *Id.* Likewise, here, Appellant's prior acquittal for "Convicted Felon in Possession of a Firearm and Ammunition and Aiding and Abetting" "in and affecting interstate and foreign commerce" did not require the exclusion of evidence of the firearm at Appellant's murder trial.

Second, in situations, as here, when the parties in question are separate sovereigns, i.e. the state and federal government, "the doctrine of dual sovereignty defeats the elements of collateral estoppel which requires that the State be a litigant in both proceedings." *Kappmeyer v. State*, 127 S.W.3d 178, 181 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The doctrine allows the states to prosecute a defendant after an unsuccessful federal prosecution "based on the same conduct even if the elements of the state and federal offenses are identical." *Id.* (quoting *United States v. Angleton*, 314 F.3d 767, 771 (5th Cir. 2002)).

In his brief, Appellant argues that the doctrine of dual sovereignty would not defeat his collateral estoppel claim because "[t]he State of Texas [was] in privity with the federal government in that the State of Texas gave the United States government every scintilla of evidence that it presented in its case in federal court." From this, we take Appellant's argument to be that the *Bartkus* exception applies to this case.

The *Bartkus* exception refers to *Bartkus v. Illinois*, 359 U.S. 121 123–24 (1959), in which the United States Supreme Court, in dictum, described a possible exception to the dual sovereignty rule where, "in a criminal proceeding, one

13

sovereign becomes so involved in another sovereign's prosecution, such that a subsequent prosecution by the non-prosecuting sovereign amounts to a 'sham and a cover' for the first prosecution." *Kappmeyer*, 127 S.W.3d at 181–82. In this situation, the implication is that the doctrine of dual sovereignty cannot be used as a basis for the latter prosecution. *Id.* at 182.

However, Texas courts have not yet explicitly recognized the *Bartkus* exception to the dual sovereignty rule. *Id.*; *see also Ex Parte Walker*, 489 S.W.3d 1, 13–14 (Tex. App.—Beaumont 2016, pet. ref'd). In any event, Appellant has shown only "permissible federal-state cooperation." *Walker*, 489 S.W.3d at 14. Therefore, the dual sovereignty rule applies.

For the above reasons, we hold that collateral estoppel did not bar the State from introducing evidence that Appellant possessed the murder weapon. We overrule Appellant's fourth issue on appeal.

We affirm the judgment of the trial court.


JIM R. WRIGHT

SENIOR CHIEF JUSTICE


March 19, 2020

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[1]

Willson, J., not participating.

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.